LUKE A. BUSBY, ESQ
Nevada Bar No. 10319
316 California Ave.
Reno, Nevada 89509
775-453-0112
luke@lukeandrewbusbyltd.com

ROGER S. DOYLE, ESQ.
Nevada Bar No. 10876
KERRY S. DOYLE, ESQ
Nevada Bar No. 10866
DOYLE LAW OFFICE, PLLC
4600 Kietzke Lane, Suite I-207
Reno, Nevada 89502
(775) 525-0889
admin@rdoylelaw.com

*Attorneys for the Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| LOLA SPENCER, | Case No.: |
| Plaintiff, | |
| vs. | **VERIFIED COMPLAINT** |
| THE CITY OF RENO, a political subdivision of the State of Nevada; and DOES 1 through 10 inclusive; | **JURY TRIAL DEMANDED** |
| Defendants. | |

COME NOW, LOLA SPENCER, an individual ("Spencer" or "Plaintiff"), by and through the undersigned counsel, and file the following complaint seeking redress for the violation of Spencer's right to just compensation for the taking of private property for public use in violation of the Fifth Amendment of the United States Constitution and the Nevada Constitution by THE CITY OF RENO, a political subdivision of the State of Nevada; and DOES I through X, inclusive.

/ / /

/ / /

/ / /

1

## JURISDICTION

1. This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 2201(a). There is federal question jurisdiction under 28 U.S.C. § 1331 because the Plaintiff allege violations of the federal Constitution. Plaintiff seek a declaration of their rights pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because they are part of the same case and controversy as Plaintiff's federal law claims.

2. This Court has personal jurisdiction over Defendants because (a) they are located in the District in which this action was filed; and (b) the actions giving rise to these claims occurred in and/or were directed from this District.

3. The City of Reno may be directly sued in Federal Court under the provisions of 42 U.S.C. § 1983 for violating the Plaintiff's rights under the 5th Amendment. *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2164 (2019).

## VENUE

4. Venue is proper pursuant to 28 U.S.C. Section 1391 in the District of Nevada because the acts giving rise to the Plaintiff' claims occurred in this District.

## PARTIES

5. Spencer currently resides, and at all times relevant hereto resided, in Washoe County and own the property located at 24 Arizona St. in Washoe County, Nevada (hereinafter, "Property").

6. The City of Reno is a local government and is a political subdivision of the State of Nevada. At all times relevant hereto, the City of Reno was acting under color of Nevada law.

## BACKGROUND FACTS

7. Swan Lake and Silver Lake occupy the lowest points of the eastern Lemmon Valley Hydrological Basin and western Lemmon Valley Hydrological Basins respectively in the "North Valleys", an area northwest of Reno in Washoe County.

8. The North Valleys include areas within the jurisdictions of the City of Reno, Washoe County, and the United States Bureau of Land Management.

9. The Eastern Lemmon Valley Hydrological Basin, containing Swan Lake, is a closed basin with an area of approximately 42 square miles.

10. Hydrologically and geographically, a "closed basin" means any water that comes into the basin, by precipitation or importation, has no natural exit or outflow. It therefore pools in the lowest point, Swan Lake, until it can naturally evaporate or infiltrate into the ground.

11. In its natural state, the only water introduced into Lemmon Valley would be annual precipitation. That rain or snow would fall on the natural, pervious desert surface, be absorbed to recharge ground water supplies, or run through natural courses to the playa bottom of the basin.

12. Natural soil and non-improved land has an estimated infiltration and absorption rate of approximately 60-90%, meaning that soil can absorb 60-90% of rain fall precipitation.

13. The level of water in Swan Lake depends on the amount of water introduced into the Basin, the ability of surface water to infiltrate into the ground, and the extent of evaporation in the playa.

14. Over the 50 years prior to 2017, Swan Lake would typically dry out during the summer months when Northern Nevada receives less precipitation. This allowed the basin to maintain adequate storage capacity to handle precipitation without causing flooding to the areas outside the natural lake boundary.

15. The annual Swan Lake level can be adversely influenced by man-made alterations to the natural water cycle, including the importation of water, discharge of treated effluent into the playa, and replacing natural desert landscape with impervious materials such as buildings, roads, and parking lots.

16. The 2017 "water-year" is defined as the period October l, 2016 to September 30, 2017. During the 2017 water year, winter storms brought precipitation to Northern Nevada.

17. Precipitation measured at the Reno-Stead fire station, near Swan Lake, showed less precipitation fell in Lemmon Valley in the 2017 water-year than fell in other relatively recent water-years, including 1986, 1994, and 2006.

18. Although there was less precipitation in Lemmon Valley than in previous years, Swan Lake and Silver Lake rose above their natural and man-made boundaries and flooded private properties surrounding the lakes.

19. The amount of precipitation that fell during the 2017 storms was within the amounts of precipitation for which engineers plan in designing development according to Washoe County and City of Reno approved design manuals.

20. The 2017 storm event was not unprecedented, rather it was a foreseeable natural event.

21. In February 2017, Washoe County determined that nearly ninety (90) private properties around Swan Lake had flood water on them and warned that it expected more impacts from flooding including failed septic systems and contaminated domestic wells.

22. As of March 12, 2017, a Federal Emergency Management Administration (FEMA) response team documented sixty-six (66) Lemmon Valley buildings with actual or threatened structural damage.

23. At the end of March 2017, Washoe County ordered the installation of HESCO barriers, which are temporary, sand- or gravel-filled, four-foot high, aggregate walls, to protect some of the properties around Swan Lake.

24. As of April 1 2017, sixty-one (61) individuals had been displaced from the Lemmon Valley area, one hundred sixty (160) homes were reported to have septic issues, and potable water had to be provided for use by area residents.

25. The effects of the flooding that began in 2017 in Lemmon Valley were long lasting, as lake water level did not naturally fall to pre-flooding conditions. The level of water in Swan Lake was higher in 2019 than it had reached at the height of flooding in 2017.

**DEVELOPMENT OF THE SWAN LAKE BASIN**

26. Beginning in the 1980s, residential and commercial development increased in the Lemmon Valley. This development effectively changed the southern end of the Swan Lake Basin from a rural area to a mixed suburban and commercial area over the past forty (40) years.

4

27. The introduction of more development and people living, working, and doing business in the Basin required the importation of millions of gallons of water for drinking, cleaning, landscape irrigation, and commercial uses.

28. That imported water never leaves the Basin in measurable quantities and adds to the annual storage requirements of Swan Lake.

29. Between 1986 and 2017, the City of Reno approved development in Lemmon Valley that resulted in approximately 1000 acres being transformed from water absorbing desert to impervious concrete, asphalt, and other impervious surfaces.

30. Impervious surfaces have an assumed infiltration and absorption rate of less than 15%. This means that 85% of water that falls on an impervious surface runs off the property downhill.

31. To address the needs of residential and commercial development in Lemmon Valley, the City of Reno operated and maintained a wastewater treatment facility, the Reno Stead Wastewater Reclamation Facility ("RSWRF") in the immediate vicinity of Swan Lake. RSWRF treats sewer and grey water before discharging it into a City maintained conveyance ditch which eventually leads to Swan Lake. RSWRF has been continuously, and ever-increasingly, discharging such water since the early 1980s.

32. The City of Reno annexed thousands of acres of property in Lemmon Valley to facilitate private and municipal development. Once planned or developed, the City of Reno accepted the dedication of the public facilities within developments, such as streets, storm drains, and sewer infrastructure for public use.

33. The City of Reno built, accepted dedication of, and maintained a network of storm water conveyance systems of drains, catch basins, channels, pipes and outlets, all emptying to Swan Lake, to drain storm water runoff from the impervious areas in Lemmon Valley created by development.

34. The City of Reno also built, accepted dedication of, and maintained a wastewater conveyance system to transport sanitary sewer influent from both the Silver Lake Basin and the Swan Lake Basin to RSWRF for treatment and discharge to Swan Lake.

5

35. The wastewater conveyance system in the Silver Lake Basin was designed, constructed and maintained by the City of Reno to transfer flood waters from Silver Lake Basin to Swan Lake Basin in the event Silver Lake flooded.

36. In addition, for every new development the City of Reno approved, there was a resultant increase in water importation into the Basin, further adversely impacting the natural hydrological cycle of evaporation and infiltration.

37. The City of Reno required importation of water through the building permit process for private or commercial development in the North Valleys.

38. The City of Reno was first placed on notice of the issue of development and its impacts on storm water and wastewater storage in the late 1980s. Various engineers and a state mandated commissioner identified problems related to development, water importation and flood storage capacities of the playa lakes in the North Valleys.

39. Three engineering studies between 1986 and 2016 placed the City of Reno on notice that engineered, designed and constructed water mitigation projects would be required to allow for development in the North Valleys without impacting existing property owners around Swan Lake.

40. The City of Reno's consulting engineers made it aware of the inevitable flooding issues in Lemmon Valley created by development at least three times in the years before the 2017 flood began.

41. In an effort to mitigate potential flooding in the area, the City of Reno adopted "low impact development standards" (LID), which required builders to implement certain structures or systems to reduce environmental impact, e.g., the implementation of water efficient restrooms.

42. The City of Reno did not enforce its LID standards. In a survey of the properties in the City of Reno built between 2002 and 2017, the City of Reno admitted that more than two-thirds of approved development properties had not included volume mitigation required by the LID standards.

43. Ninety percent of the developments approved by the City of Reno had no effective flood mitigation improvements that would protect downstream residents from the impacts of development.

44. The City of Reno continued approving plans for development, including approving an 800,000 square-foot commercial facility adjacent to Swan Lake after the flooding problems in 2017.

45. The City of Reno approved at least thirty-five (35) large scale development projects between 2002 and 2017.

46. The City of Reno specifically owns and maintains property on which three (3) major channels direct storm water from developments within City jurisdiction to Swan Lake: (a) Horse Creek (or no name creek), which runs from Stead Boulevard past the Reno Stead Wastewater Reclamation Facility ("RSWRF") and into Swan Lake; (b) a drainage channel in the vicinity of Military Road and Mahon Drive, which drains to Swan Lake; (c) and the Lemmon Drive Drainage channel, which runs from Lemmon Valley Drive in the area south of Swan Lake and into Swan Lake.

47. Both residential and commercial properties, plans for which were approved by the City of Reno, drain storm water into those conveyances that are public improvements owned and maintained by the City of Reno.

**OPERATION OF RSWRF CAUSES FLOODING IN SWAN LAKE**

48. The City of Reno also owns and operates RSWRF, which is a public improvement that provides sewer service for commercial and residential properties in the Silver Lake and Swan Lake basins, treats that sewage, and discharges treated effluent water into ditches and channels that lead to Swan Lake.

49. In the past, commercial and residential development in Lemmon Valley was limited by the amount of potable water available to serve the area. Development in Lemmon Valley was made possible by importing potable water into the basin to serve those properties.

50. At the time of the 2017 Flood, the Nevada Department of Environmental Protection (NDEP) permitted RSWRF to process a 30-day average of 2.35 million gallons/day

7

("MGD") of treated effluent which is discharged into a City maintained ditch leading to Swan Lake. The NDEP further prohibited any discharge greater than 4.13 MGD.

51. The City of Reno is permitted by the State Water Engineer to discharge treated effluent into the creeks and ditches that lead to Swan Lake in no more than 336 acre-feet annually for use on a nature preserve.

52. The NDEP permit expressly provides that it does not grant the City of Reno any right to invade or damage any private property by its discharge of water through RSWRF.

53. Between December 2016 and April 2017, RSWRF discharged effluent significantly in excess of its NDEP permitted amount.

54. Between December 2016 and April 2017, RSWRF discharged nearly twice the permitted amount of annual water allowed by the State Water Engineer.

55. Between December 2016 and April 2017, RSWRF discharged effluent in excess of an amount it could accurately measure for more than seven (7) days. The measuring devices for effluent discharge to Swan Lake at the RSWRF facility were limited to 3.2 MGD. Between December 2016 and April 2017, an internal gauge at RSWRF measured a flow of over 7 MGD, at different points in time.

56. During 2017, Silver Lake, in the hydrological basin adjacent to Swan Lake, was also experiencing extremely high water-levels.

57. The City was aware from engineering studies prior to 2017 that water from Silver Lake basin should not be intended or designed to be transferred to Swan Lake basin without mitigation.

58. Using a sewer lift station built at the corner of Moya and Lear Boulevard, the City of Reno pumped sewer water, storm water, and water from Silver Lake to RSWRF and discharged that water into creeks and ditches leading to Swan Lake through RSWRF. This active pumping resulted in superinduced water moving from Silver Lake to Swan Lake beginning in February 2017 and lasting for nearly 18 months.

59. The City of Reno's sewer lift station at the intersection of Moya and Lear was built below ground and proximate to Silver Lake in a manner that it was foreseeable that a storm

8

event would have caused water from Silver Lake to inundate the lift station, requiring the pumping that actually occurred. In other words, it was foreseeable that in the event of a substantial storm event, the lift station at Moya and Lear could be used to lower the water-level of Silver Lake at the expense of Swan Lake, and this occurred.

60. The City of Reno used the Moya lift station to pump in excess of 279 acre-feet of water from Silver Lake to Swan Lake in 2017 and an additional 185 acre-feet in 2018.

61. The City of Reno was substantially involved in the development of private land in Lemmon Valley, including, but not limited to, its approving plans and accepting dedication of storm and wastewater discharge systems and by building its own storm water and wastewater systems in Lemmon Valley to facilitate such development and to convey increased runoff created by development to Swan Lake, causing the Plaintiff' property to flood.

**FLOODING OF SPENCER'S PROPERTY**

62. Spencer purchased the real property at 24 Arizona St., Reno, Nevada ("the Property") in August of 2014.

63. The Property was a single-family residence on 1.049 acres located at approximately 4920' elevation.

64. Spencer lived on the Property as of December 2016.

65. In Spencer's neighborhood, drainage culverts normally carry rainwater down Idaho Street and under Lemmon Drive to empty into Swan Lake.

66. As Swan Lake's level rose beginning in December 2016, water could no longer flow into the Lake and it flowed back up the drainage culverts running under Lemmon Drive.

67. Water from Swan Lake physically invaded Spencer's property beginning January of 2017.

68. Swan Lake continued to rise and crested above Lemmon Drive which is located at an elevation of 4922' in February and March 2017.

69. Swan Lake water levels continued to rise until a peak of approximately 4923.5' in April 2017.

70. Water contiguous to Swan Lake physically invaded Spencer's Property between January of 2017 until approximately March of 2017

71. Spencer incurred approximately $4000 in out-of-pocket expenses related to repairs to the home and replacing items lost or destroyed in the flood and materials to repair the house.

72. Experts have opined that the soils under the Spencers' residence are saturated due to the extent and duration of the flooding event. The saturated soils have moved as they swell and shrink with moisture content resulting in movement of the Spencers' residence. This movement will continue for months or years to come and cause recurring damage to the structures on the Property. The City of Reno caused a physical invasion of superinduced water to the Plaintiff's real and personal property that resulted in a barrier to access and the effectual impairment of the use and enjoyment of the Property for a substantial period of time.

73. Waters from Swan Lake further damaged and/or destroyed Spencer' personal property.

74. The flood waters caused substantial injury to or substantial interference with the Plaintiff's use of, enjoyment of, and access to their real and personal property by: covering their property water with storm and wastewater; interfering with the use of septic systems and wells; causing structural damage to houses and other structures; closing roads; and otherwise limiting the use of Plaintiff's real and personal properties in their intended manner.

75. The City of Reno directly discharged effluent through RSWRF into creeks and ditches that lead Swan Lake, causing the Plaintiff's property to flood.

76. The City of Reno pumped storm water from Silver Lake to Swan Lake, causing the Plaintiff's property to flood.

**PROCEDURAL BACKGROUND**

87. In May 2017, private property owners brought an action in state court against the City of Reno for the claims of inverse condemnation, trespass, nuisance, and conversion of personal property, CV17-01041 in the Second Judicial District Court ("state case").

77. Plaintiffs in the state case moved for class certification on October 30, 2017. The state court granted certification on February 14, 2018 for a class of individual property owners whose properties had been physically invaded by water from Swan Lake at any time between January 1, 2017 and May 31, 2017 and that physical invasion substantially impaired or interfered with the owner's access to, value of, and/or use and enjoyment of owner's property.

78. The state court bifurcated the discovery and trial into liability and damages phases. At issue in the liability phase of the state case was whether the City caused a taking for public use by injuring the class members. The extent and amount of compensation due for the taking was held in abeyance until after a liability determination was made.

79. The state case against the City of Reno proceeded trial on behalf of the class with three class representatives in June 2019. The jury, by unanimous verdict, found that the City had directly and proximately caused the flooding around Swan Lake between January 1, 2017 and May 31, 2017. The jury additionally found by unanimous verdict that the City used the class members' private properties for public use. The City admitted and conceded that no formal condemnation proceedings had been initiated, no payments had been made, and that the class representatives were owners of the properties they claimed were flooded.

80. The state court judge issued *Findings of Fact and Conclusions of Law* ruling that the City had physically invaded the class members' property with water from Swan Lake resulting in a compensable taking.

81. After the liability verdict in favor of the class members, the City moved to decertify the class for the purposes of damages trial only in November 2019.

82. On July 6, 2020, the state court agreed to decertify the class for the purposes of damages trial only and that the issue of legal liability was determined conclusively to all class members.

83. For the purposes of statute of limitations, all periods between October 30, 2017 and July 6, 2020 are tolled as a matter of law for each member of the class action.

///

///

## CLAIMS FOR RELIEF

### 42 U.S.C. § 1983 - VIOLATION OF THE TAKINGS CLAUSE OF THE FIFTH AMENDMENT

84. Plaintiff repeats and realleges the allegations set forth in the foregoing Paragraphs as though fully set forth herein.

85. The Fifth Amendment to the United States Constitution provides in relevant part: "[N]or shall private property be taken for public use, without just compensation."

86. Defendant took the Plaintiff's private Property for public use.

87. Defendant has not instituted formal proceedings to take the Plaintiff's real or personal property.

88. Defendant has not paid just compensation to the Plaintiff for the taking of Plaintiff's real or personal property.

89. By its conduct, as described herein, Defendant is liable to the Plaintiff under 42 U.S.C. § 1983 for taking the Plaintiff' property for public use without first paying just compensation by physical invasion of water resulting from active pumping and discharge of water; failure to design, engineer, construct or maintain storm water and wastewater conveyances in a manner as not to foreseeably flood private property; and through acceptance of dedications and annexation of infrastructure to transport storm water and wastewater from one private property to another.

90. Defendant City of Reno has directly acted to and developed, implemented, enforced, encouraged and sanctioned express and implied de facto policies, practices, and/or customs of unlawfully using the Property of others for the storage of floodwaters without having first paid just compensation.

91. The Constitutional abuses and violations by Defendant City of Reno were and are directly and proximately caused by policies, practices and/or customs developed, implemented, enforced, encouraged and sanctioned by the City of Reno, including its practice and policy of unlawfully using the Plaintiff' Property as storage for its flood waters.

92. Pursuant to 42 U.S.C. § 1983, Plaintiff seek and are entitled to declaratory relief declaring that the acts of the City described herein violate the United States Constitution.

93. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff are entitled to money damages for the unconstitutional taking of their property as well as declaratory relief.

94. Plaintiff are therefore entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

95. In addition to the relief requested above, the Plaintiff requests relief as described in the prayer for relief below.

**VIOLATION OF THE TAKINGS CLAUSE OF THE NEVADA CONSTITUTION**

96. Plaintiff incorporates all preceding paragraphs as though each were fully set forth verbatim herein.

97. The Defendant's acts and/or omissions described above constitute a taking of the Plaintiff' property in violation of Article 1, Section 8(3) of the Nevada Constitution.

98. The Plaintiff has a real or personal interest in the property taken by the Defendants.

99. The taking of the Plaintiff's property was for public use.

100. The Plaintiff has not been paid just compensation by the Defendants for the taking of Plaintiff' property.

101. The taking of the Plaintiff's property was proximately caused by the Defendants, who are government entities.

102. The Defendants have not instituted formal proceedings for the taking of the Plaintiff's property.

103. The Plaintiff has suffered damages as a result of the taking of their property by the Defendant and are entitled to compensation as set forth by Article 1, Section 22(4) of the Nevada Constitution.

104. The Plaintiff has been required to seek professional engineering and legal services to prosecute this action, and, accordingly, are entitled to recover their reasonable attorney fees together with other costs incurred therefor.

**TRESPASS**

105. Plaintiff incorporates all preceding paragraphs as though each were fully set forth verbatim herein.

106. The Defendant knowingly entered Plaintiff's private real property by introducing superinduced volumes of water onto and into the land.

107. Defendant substantially changed, wrongfully appropriated, damaged and/or destroyed the Plaintiff's real property.

108. The above-described actions by the Defendant amount to the trespass of the Plaintiff's real property.

109. As a direct and proximate result of the Defendant's physical invasion of the Plaintiff's real property, the Plaintiff have suffered and continue to suffer damages in an amount to be determined.

**CONVERSION**

110. Plaintiff incorporates all preceding paragraphs as though each were fully set forth verbatim herein.

111. The Defendant substantially changed, wrongfully appropriated, damaged and/or maliciously destroyed the Plaintiff's personal property causing great inconvenience.

112. The above-described actions by Defendant amount to the conversion and/or malicious destruction of the Plaintiff's personal property.

113. As a direct and proximate result of the Defendant substantially changing, damaging and destroying the Plaintiff's personal property, the Plaintiff has suffered and continue to suffer damages.

**NUISANCE**

114. Plaintiff incorporates all preceding paragraphs as though each were fully set forth verbatim hereat;

115. Defendant by their own actions, as described above, substantially and unreasonably interfered with the Plaintiff's use and enjoyment or their property for which the Plaintiff actually possess;

116. These actions by Defendant amount to a private nuisance; and

117. As a direct or proximate result of the private nuisance brought to the Plaintiff's property by the Defendant, the Plaintiff has suffered and will continue to suffer damages.

WHEREFORE, the Plaintiff request that this Court:

A. Enter a declaratory judgment that the actions complained of herein are unlawful and violate the United States Constitution;

B. Order Defendant to pay just compensation to Plaintiff in amounts to be proven at trial;

C. Order Defendant to pay compensatory and consequential damages in an amount to be proven at trial;

D. Order Defendant to pay attorneys' fees and costs of the action pursuant to 42 U.S.C. § 1988, or state law;

E. Order Defendant to pay pre- and post- judgment interest at the legal rate on such damages as appropriate; and

F. Grant any further relief that the Court deems just and proper.

**DATED** this __12/23/2020__

By: _/s/ Luke A. Busby_
LUKE A. BUSBY, ESQ
Nevada Bar No. 10319
316 California Ave.
Reno, Nevada 89509
775-453-0112
luke@lukeandrewbusbyltd.com

ROGER S. DOYLE, ESQ.
Nevada Bar No. 10876
KERRY S. DOYLE, ESQ
Nevada Bar No. 10866
DOYLE LAW OFFICE, PLLC
4600 Kietzke Lane, Suite I-207
Reno, Nevada 89502
(775) 525-0889
admin@rdoylelaw.com

*Attorneys for the Plaintiff*

Exhibit List

1. Verification